AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE CELLULAR TELEPHONE ASSIGNED<br>CALL NUMBER (937) 242-3170 | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:19 mj 507 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* See Attachment A-2. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B-2.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g)(1) | Being a Felon in Possession of a Firearm |
| 26 U.S.C. 5861(d) | Receiving or Possessing a Firearm Not Registered in the National Firearms Registration and Transfer Record |

The application is based on these facts:
See attached affidavit. To ensure technical compliance with 18 U.S.C. 3121-3127, the warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the ATF. See 18 U.S.C. 3122(b), 3123(b).

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested

under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dominick S. Gerace, Assistant United States Attorney
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/16/19

_____
*Judge's signature*

City and state: DAYTON, OHIO

Hon. Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(937) 242-3170** | Case No. _____ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Timur Housum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for search warrants under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the

location of the following cellular telephones:

a.   The cellular telephone assigned call number **(937) 287-0250** ("**Target Cell Phone**

**#1**"), whose service provider is Verizon, a wireless telephone service provider

headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.  **Target**

**Cell Phone #1** is described herein and in Attachment A-1, and the location

information to be seized is described herein and in Attachment B-1.

b.   The cellular telephone assigned call number **(937) 242-3170** ("**Target Cell Phone**

**#2**"), whose service provider is T-Mobile, a wireless telephone service provider

headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  **Target Cell Phone #2** is

described herein and in Attachment A-2, and the location information to be seized

is described herein and in Attachment B-2.

2.      Because these warrants seek the prospective collection of information, including

cell-site location information, that may fall within the statutory definitions of information

collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrants are designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrants therefore include all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent (S/A) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since July 2015. I have been involved in illegal firearms related arrests; the execution of search warrants, which resulted in the seizure of firearms; and supervised the activities of informants who provided information and assistance resulting in firearm purchases. Since 2015, I received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; firearms investigations; and various other criminal investigations resulting in successful prosecution. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of illegal firearms, the laundering of illegal proceeds, and the organization of illegal firearm conspiracies.

4. In the course of conducting firearms investigations in violation of federal law, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and nontelephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of firearms, contraband, and evidence of criminal activity.

5.      I have repeatedly encountered a practice wherein illegal firearm sellers distribute a cellular telephone number to their customers, often described by these illegal sellers as a "money phone." The "money phone" is used primarily to communicate with those customers. The customers will subsequently call or send a text message to the illegal firearm seller on that cellular telephone number to arrange a purchase of firearms as needed. The illegal firearm seller will many times field calls or text messages from several customers, and then direct those customers to travel in their car to a designated meeting point. Once the customer has driven to the designated places, the illegal firearm seller will appear in his vehicle, quickly conduct hand to hand firearm transactions with the customer, and then drive away. I have also encountered the practice of illegal firearm sellers fielding calls from customers and directing those customers to "stash houses" which are used to store, sell, and/or manufacture illegal firearms.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C § 922(g)(1) (Being a Felon in Possession of a Firearm), and 26 U.S.C. § 5861(d) (Receiving or Possession a Firearm Not Registered in the National Firearms Registration and Transfer Record), have been committed, are being committed, and will be committed by Jordan CARPENTER (hereinafter referred to as "CARPENTER") utilizing **Target Cell Phone #1** and **Target Cell Phone #2**. There is also probable cause to believe that the location information described in Attachments B-1 and B-2 will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the

3

commission of these offenses, as well as the identification of locations involved in these offenses.

8.      The Court has jurisdiction to issue the proposed warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.      The United States, including ATF, is conducting a criminal investigation of Jordan CARPENTER regarding possible violations of Title 18, United States Code, Section 922(g)(1), and Title 26, United States Code, Section 5861(d).

10.      Title 18, United States Code, Section 922(g)(1) prohibits any person who has previously been convicted of a felony offense—*i.e.*, an offense punishable by imprisonment for a term exceeding one year—from possessing any firearm or ammunition in and affecting interstate commerce.

11.      Title 26, United States Code, Section 5861(d) prohibits any person from receiving or possessing a firearm which is not registered to that person in the National Firearms Registration and Transfer Record.  For purposes of this provision, "firearm" is defined as, among other things, a "machinegun." 26 U.S.C. § 5845(a).  A "machinegun" is defined, in part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

12.      A confidential informant (hereinafter "CI") for the Warren County Drug Task Force (WCDTF) provided information to law enforcement regarding CARPENTER in late July

2019. The CI's identity is documented by WCDTF and is known to detectives. The CI is working for consideration in a pending criminal case. The CI has provided reliable and actionable information in assisting WCDTF since July 2019, and is currently assisting ATF with a federal criminal investigation. Information provided by the CI has been corroborated throughout the course of ATF and WCDTF investigations. Information provided by the CI, as well as actions of the CI at the direction of WCDTF, have resulted in obtaining physical evidence of federal and state criminal violations. The CI is therefore considered to be truthful and reliable.

13.     In or about late July 2019, your Affiant and WCDTF Detective (Det.) Hawk interviewed the CI regarding alleged violations of federal firearm laws by CARPENTER. During the interview, the CI stated that CARPENTER had offered to sell to the CI fully automatic rifles for $2,500.00 per firearm. The CI stated that CARPENTER informed the CI that all firearms were built from an AR platform and ranged in calibers from .223, 7.62, and 300 blackout.

14.     The CI stated that CARPENTER lived somewhere in the east end of Dayton, Ohio, and provided **Target Cell Phone #1** as belonging to CARPENTER. The CI stated that CARPENTER previously had served jail time for Felonious Assault, and had recently been shot in another confrontation.

15.     Your Affiant conducted a records check related to CARPENTER. The records check revealed that CARPENTER was convicted in July 2014 of Felonious Assault (serious harm) (F2), in violation of Ohio Rev. Code § 2903.11 9(A)(1), in the Common Pleas Court of Montgomery County, Ohio, in Case Number 2014 CR 00265. The termination entry for the case shows that CARPENTER was sentenced to three years of imprisonment for the conviction.

16. In late July 2019, your Affiant was contacted by Det. Hawk, who stated that CARPENTER had made contact with the CI via **Target Cell Phone #1** and had agreed to sell a .223 caliber rifle suspected of being a machinegun for a purchase price of $2,500.00.

17. On or about July 31, 2019, ATF, with the assistance of members of WCDTF, conducted an undercover buy operation, using an undercover officer (UC) and the CI, to purchase from CARPENTER a .223 caliber rifle suspected of being a machinegun. Prior to the transaction, a search of the CI's person was conducted for contraband and weapons, which produced negative results. The UC was provided with an electronic transmitting/recording devices and prerecorded buy money for the purchase of the suspected machinegun.

18. The transaction took place in the parking lot of Miami Valley Gaming Casino, located at 6000 OH-63, Lebanon, Ohio, on July 31, 2019. Upon entering the parking lot of Miami Valley Gaming Casino in an undercover vehicle with the UC, the CI contacted CARPENTER, at **Target Cell Phone #1**, to let CARPENTER know where to meet. CARPENTER responded back using **Target Cell Phone #1**, and stated that he (CARPENTER) had to get gas at the Shell Gas Station, and would arrive shortly.

19. A short time later, law enforcement surveillance units observed a white Mercury Sable bearing Ohio plate (HMR2214) pull into the parking lot of Miami Valley Gaming Casino and park next to the undercover vehicle. A records search conducted prior to the operation showed that the white Mercury Sable vehicle was registered to CARPENTER.

20. When CARPENTER arrived, the UC observed CARPENTER exit the white Mercury Sable, and walk to the trunk of that vehicle. The UC visually identified the individual as CARPENTER. The UC observed CARPENTER open the trunk of the white Mercury Sable. The UC exited the undercover vehicle and joined CARPENTER at the trunk of CARPENTER's

6

vehicle. While at the trunk of CARPENTER's vehicle, the UC observed CARPENTER pull the magazine out of the suspected machinegun rifle, wrap the rifle in a gray blanket, and carry the rifle into the rear passenger seat of the undercover vehicle.

21.     CARPENTER and the UC then entered the undercover vehicle to finish the transaction. The suspected machinegun rifle that the UC obtained from CARPENTER is a black, American Built Custom (ABC), multi-caliber rifle, model ABC-15, bearing serial number ABC-1353. While in the undercover vehicle, CARPENTER began talking about guns with the UC. CARPENTER stated he could get anything as small as a 9 mm all the way up to an AR10. When the UC made remarks about the quality of the suspected machinegun rifle that CARPENTER had provided to the UC, CARPENTER began stating to the UC the firearm had a free-floating barrel, a red dot scope, and a laser. CARPENTER further stated, "I found a new way to rig these," as he showed the UC how the laser functioned. The UC handed CARPENTER $2,500.00 in pre-recorded buy money. CARPENTER took the money and counted it, confirming it was $2,500.00.

22.     CARPENTER then told the UC that the UC could purchase a 7.62 x 39 caliber rifle for the same price, and that the price is more expensive for larger caliber rifles. CARPENTER further stated to the UC, "if you have any problems at all with the rifle let me know" and "bring it back to me and I will have it fixed for free, no problems." CARPENTER provided the UC with the contact number of **Target Cell Phone #1** for future business.

23.     CARPENTER also stated to the UC, "If you buy in bulk, the prices go down," and referenced a number range of between 5 to 10 firearms. CARPENTER stated, "soon I will have the ability to make or cut these out of raw steel so they will be blank," and went on to state "the lathe is still being played with but we will have the ability to make entire Glocks and

1911s." At that time, the UC asked if CARPENTER had made the suspected machinegun rifle that was purchased by the UC. CARPENTER responded that he did not make the rifle.

24.     CARPENTER then picked up the suspected machinegun rifle from the back seat, pushed out the rear take-down pin to expose the internal mechanisms of the firearm, and began explaining the functions of the firearm. CARPENTER stated that the internal components were "M16 internals" and "these are not just shaved and all that stupid bullshit." CARPENTER closed the rifle, pushed in the rear take-down pin, and stated to the UC, "You have total trigger control." CARPENTER went on to show the UC how to rotate the safety selector switch from safe to semi-automatic, and from semi-automatic to fully automatic.

25.     After CARPENTER exited the vehicle, he drove off in his white Mercury Sable. A debrief was conducted after the buy operation and the UC confirmed that CARPENTER was the individual that conducted the sale of the suspected machinegun.

26.     Following the transaction, the suspected machine gun sold to the UC by CARPENTER was test fired by Lt. Miller, Warren County Sherriff's Office Range Officer and Armorer. The rifle functioned in full automatic mode, shooting more than one shot, without manual reloading, by the single function of the trigger. The suspected machinegun is currently in the lawful possession of the ATF.

27.     A search of the National Firearms Registration and Transfer Record revealed that the machinegun sold by CARPENTER to the UC is not registered to CARPENTER.

28.     On August 7, 2019, at approximately 2015 hours, the UC placed a recorded call to CARPENTER at **Target Cell Phone #1**, but was unable to make contact. At approximately 2117 hours on that same day, the UC received a call from **Target Cell Phone #2**. The UC was able to identify the voice of the male caller that was using **Target Cell Phone #2** as the voice of

CARPENTER.  The UC asked if CARPENTER was still good for the "other," referring to a suspected 7.62 caliber machinegun that CARPENTER had for sale, and for a meeting date sometime in the following week.  CARPENTER stated, "That's fine," and further stated, "Yeh I got one right now, it's the 7.62 x 39."  CARPENTER went on to confirm the price for the 7.62 caliber suspected machinegun was the same price as the .223 caliber machinegun that the UC purchased from CARPETNER for $2,500.00, as discussed above.

29.	CARPENTER went on to state that he had two other suspected machineguns being made in 9 mm caliber. CARPENTER stated, "I'm waiting for them to be assembled," and "they are gonna have shortened buffer tubes on em and should look really nice."  CARPENTER went on to ask the UC if the UC knew anyone who wanted semi-automatic rifles.  CARPENTER further stated, "I have Serbian M92s" and "they are like mini AKs," and that the purchase price for those firearms is $700.00.  When informed by the UC that the UC had a lot of friends interested in buying some of the fully automatic rifles and that the UC might be able to move some of the rifles for CARPENTER, CARPENTER stated "If you can your price will go down."

30.	Based on the above, I submit that there is probable cause to believe that violations of 18 U.S.C § 922(g)(1) (Being a Felon in Possession of a Firearm), and 26 U.S.C. § 5861(d) (Receiving or Possession a Firearm Not Registered in the National Firearms Registration and Transfer Record), have been committed, are being committed, and will be committed by CARPENTER utilizing **Target Cell Phone #1** and **Target Cell Phone #2**.   There is also probable cause to believe that the location information described in Attachments B-1 and B-2 will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses, as well as the identification of locations involved in these offenses.

9

31.     Based on my training and experience, I know that collecting location information for **Target Cell Phone #1** and **Target Cell Phone #2** for a 30-day period will assist investigators in locating **Target Cell Phone #1** and **Target Cell Phone #2** and help to identify users of **Target Cell Phone #1** and **Target Cell Phone #2**, which are being used to commit federal firearms offenses.  Further, the information requested will assist the ATF in identifying co-conspirators, and additional cellular devices owned and operated by the co-conspirators, as well as locations used in furtherance of the illegal activities outlined herein.

32.     In my training and experience, I have learned that Verizon and T-Mobile are companies that provide cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, range to tower (RTT), failed RTT, text message content, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

10

33.     Based on my training and experience, I know that Verizon and T-Mobile can collect E-911 Phase II data about the location of **Target Cell Phone #1** and **Target Cellphone #2**, by initiating a signal to determine the location of the **Target Cell Phone #1** and **Target Cell Phone #2** on Verizon's and T-Mobile's networks or with such other reference points as may be reasonably available.

34.     Based on my training and experience, I know that Verizon and T-Mobile can collect cell-site data about **Target Cell Phone #1** and **Target Cell Phone #2**.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as Verizon and T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**AUTHORIZATION REQUEST**

35.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

36.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrants has been completed.  There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or

11

user of **Target Cell Phone #1** and **Target Cell Phone #2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachments B-1 and B-2, which are incorporated into each warrant, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

37.  I further request that the Court direct Verizon and T-Mobile to disclose to the government any information described in Attachments B-1 and B-2 that is within the possession, custody, or control of Verizon and T-Mobile. I also request that the Court direct Verizon and T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B-1 and B-2 unobtrusively and with a minimum of interference with Verizon's and T-Mobile's services, including by initiating a signal to determine the location of the **Target Cell Phone #1** and **Target Cell Phone #2** on Verizon's and T-Mobile's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon and T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

38.  I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate **Target Cell Phone #1** and **Target Cell Phone #2** outside of daytime hours.

39.    I further request that the Court order that all papers in support of the applications, including the affidavits and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Timur Housum
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on August 16, 2019.

HON. MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A-1

### Property to Be Searched

1. The cellular telephone assigned call number **(937) 287-0250** ("**Target Cell Phone #1**"), whose wireless service provider is Verizon, a company headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

2. Records and information associated with **Target Cell Phone #1** that is within the possession, custody, or control of Verizon including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT A-2**

**Property to Be Searched**

1.  The cellular telephone assigned call number **(937) 242-3170** ("**Target Cell Phone #2**"), whose wireless service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.  Records and information associated with **Target Cell Phone #2** that is within the possession, custody, or control of T-Mobile including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B-1

### Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

All information about the location of **Target Cell Phone #1** described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of **Target Cell Phone #1**" includes all available E-911 Phase II data, range to tower (RTT), failed RTT, text message content, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government. In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of **Target Cell Phone #1** on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to Be Seized by the Government**

**IF LOCATION INFORMATION IS EVIDENCE OF A CRIME:**

All information described above in Section I that constitutes evidence of violations of Title 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861(d) involving **Jordan CARPENTER**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## ATTACHMENT B-2

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

All information about the location of **Target Cell Phone #2** described in Attachment A-2 for a period of thirty days, during all times of day and night.  "Information about the location of **Target Cell Phone #2**" includes all available E-911 Phase II data, range to tower (RTT), failed RTT, text message content, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government.  In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of **Target Cell Phone #2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to Be Seized by the Government**

**IF LOCATION INFORMATION IS EVIDENCE OF A CRIME:**

All information described above in Section I that constitutes evidence of violations of Title 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861(d) involving **Jordan CARPENTER**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.